# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 08 CR 1028-6 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| COREY STEWART ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Corey Stewart was indicted on various charges stemming from his alleged participation in a conspiracy to distribute cocaine. (Indictment, Doc. No. 110.) This matter comes before the court on Stewart's motion to suppress evidence obtained through a government wiretap. (Mot. to Suppress Title III Material, Doc. No. 221.)

### I. BACKGROUND

According to the Government, Robert Atkins was the leader of a drug trafficking organization responsible for distributing wholesale amounts of cocaine to mid-level dealers throughout Chicago's west and northwest suburbs. (Kays Aff. ¶ 5, Doc. No. 1.) Stewart was allegedly one of those mid-level dealers. (*Id.* ¶¶ 89-95, 143-47.)

The Government used a number of traditional methods to investigate the Atkins organization, including physical surveillance, cooperating witnesses, pen registers, and "trash covers." (Biegalski Aff. ¶¶ 49-73, TIII_001-00019.) According to the Government, these methods were of limited utility and failed to uncover the full scope of the Atkins conspiracy. (*See id.*) On February 21, 2007, the Government applied for a wiretap on one of the cell phones used by the Atkins organization, which was subsequently granted by Chief Judge Holderman. (Application for An Order Authorizing Interception of Wire Communications, TIII_001-00001, *et seq.*; Order Authorizing the

Interception of Wire Communications, TIII_001-00075, *et seq*.)  Between March and June of 2007, the Government submitted applications for additional wiretaps on other phones used by members of the Atkins organization, all of which were granted. (*See*, *e.g*, Application for An Order Authorizing Interception of Wire Communications, TIII_002-00001, *et seq.*; Orders Authorizing the Interception of Wire Communications for Phones 3, 5-8, TIII_003-00145, *et seq*.)  Some of the conversations intercepted by the Government allegedly involve Stewart discussing drug deals with Atkins. (Kays Aff. ¶¶ 89-95, 143-47.)

Stewart was subsequently indicted for conspiracy to distribute cocaine, along with Atkins and several other members of the Atkins organization (collectively, "Defendants"). (Indictment Cts. I, XI, XVI.)  Stewart now moves to suppress all recordings and transcripts obtained as a result of the government wiretaps. (Mot.)

## II. LEGAL STANDARD

18 U.S.C. § 2518 requires that "[e]ach application for an order authorizing or approving the interception of a wire, oral, or electronic communication . . . shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(c)(1). This has become known as the "necessity requirement," though it "should not be understood as requiring absolute necessity." *United States v. Campos*, 541 F.3d 735, 746 (7th Cir. 2008). The Government's burden of proving necessity is "not great," and the requirement is "reviewed in a practical and common-sense fashion." *Id.* (quoting *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006)). "To receive a wiretap order, the government need not demonstrate that

prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means." *McLee*, 436 F.3d at 763. Nor does the Government have to demonstrate "'that any other investigative procedures be tried first before an order is issued for the interception of wire communications,' or that a wiretap be used as a last resort." *Campos*, 541 F.3d at 746 (quoting *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976)) (internal citations omitted). Rather, section 2518 "requires only that the success of other methods of investigation appears unlikely or too dangerous." *Id*. Section 2518 "was *not* intended to ensure that wiretaps are used only as a last resort in the investigation, but rather that they are 'not . . . be routinely employed as the initial step' in a criminal investigation." *McLee*, 436 F.3d at 762-63 (quoting *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991)) (emphasis in original).

### III. ANALYSIS

#### A. The February 2007 Wiretap

Stewart argues that "the government failed to show that normal investigative procedures were either inadequate or too dangerous," and that the Government's explanation for its "failure to utilize proven techniques such as suspect interviews and warranted searches relied on boilerplate generalizations, and did not address the specifics of the instant investigation." (Mot. at 2-3.) The Government argues that its application for the wiretap sets forth with sufficient specificity why a wiretap was necessary to reveal "the full scope of Atkins['] organization or the roles played by other members of the conspiracy." (Resp. at 14, Doc. No. 232.) The court agrees with the Government.[1]

---

[1] Stewart argues that he has standing as an "aggrieved person" to challenge the admission of all wiretap evidence obtained by the Government, including conversations to which Stewart was not a party.

3

In the affidavit supporting the Government's application for a wiretap, FBI Agent Michael J. Biegalski explains why "normal investigative procedures" would be insufficient to determine the full scope of the Atkins conspiracy. (*See* Biegalski Aff. ¶¶ 49-73.)

*First*, Agent Biegalski avers that the Government's attempts to use physical surveillance were limited by various tactics Defendants used to avoid detection by law enforcement, such as meeting in different public locations, using cell phones to discuss drug deals, employing "runners," and making hand-to-hand transfers in their automobiles. (*See id.* ¶¶ 51-55.) Defendants also engaged in counter-surveillance by keeping a lookout for unfamiliar cars and requiring customers to call from home after completing a drug transaction to confirm that they had not been intercepted by law enforcement. (*See id.*) To complicate matters further, Atkins operates a recording studio called "Krunch Tyme Entertainment" as a front through which he launders drug proceeds. (*See id.*) Because Krunch Tyme operates at least in part as a legitimate business, simply monitoring the comings-and-goings of Atkins' associates offered no clue as to whether their dealings with Atkins were legitimate or illegitimate. (*See id*.) The Government's inability to determine the full scope of the alleged conspiracy from physical surveillance therefore supports Chief Judge Holderman's determination of necessity. *See Campos*, 541 F.3d at 747 (holding that limitation on information that could be obtained from physical surveillance, and defendants' counter-surveillance, supported necessity of wiretap); *United States v. Price*, 418 F.3d 771, 778 (7th Cir. 2005) (holding that defendants' counter-surveillance supported necessity of wiretap).

---

(Mot. at 1-2.) Because the court finds that the Government's wiretap application satisfies the requirements of 18 U.S.C. § 2518, we need not address the issue of standing.

*Second*, Agent Biegalski explains that the Government's attempts to use pen registers, trap-and-trace, and telephone analyses were subject to limitations inherent in those investigative techniques. (*See* Biegalski Aff. ¶ 56.) "Pen registers merely confirmed a contact between two telephones and could not identify the persons talking or the nature of the conversations." *United States v. Gray*, 410 F.3d 338, 343 (7th Cir. 2005); *see also Campos*, 541 F.3d at 747 (acknowledging limitations of pen registers, trap-and-trace). The Government was able to determine that certain defendants (or at least telephones ascribed to certain defendants) were communicating with one another, but not whether those defendants were involved in Atkins' drug business. (*See* Biegalski Aff. ¶ 56.) The limited utility of pen registers and similar devices is another reason why the wiretaps were necessary in this investigation.

*Third*, Agent Biegalski avers that the Government attempted several "trash covers," none of which bore any fruit. (*See id*. ¶¶ 71-73.) Agent Biegalski states that it was difficult to obtain useful evidence from trash covers because Krunch Tyme shares a dumpster with other nearby businesses. (*See id.*) Agent Biegalski also explains that contacting the local waste management service to arrange for a trash cover could potentially compromise the secrecy of the investigation. (*See id.*) Thus, the problems associated with using trash covers in the investigation supports Chief Judge Holderman's wiretap order.

*Fourth*, Agent Biegalski describes how the Government recruited two cooperating witnesses within the Atkins organization, CW1 and CW2, but that those witnesses' ability to provide information was hampered by Defendants' "compartmentalization" of their illegal activities. (*See id*. ¶¶ 57-64.) CW1 was hired by Atkins to provide security,

5

but was never directly involved in Atkins' business discussions or drug deals. (*See id.*) According to CW1, it would have been unusual and suspicious for CW1 to seek out a more active role in the Atkins organization. (*See id.*) CW2 was a mid-level cocaine dealer, and often purchased narcotics from the Atkins organization. (*See id.*) But Defendants were careful to keep CW2 at arms' length, even forbidding CW2 from visiting his supplier's home to pick up merchandise. (*See id.*) As a result, CW2 had limited knowledge of the other players in the conspiracy. (*See id.*) CW2 also believed that it would be unusual and suspicious for him to purchase larger quantities of cocaine or otherwise become more involved in the Atkins organization. (*See id.*) Although CW2 attempted to record some of his conversations with Defendants, his efforts were hampered by technical difficulties and CW2's fear of being discovered. (*See id.*) The fact that the Government's confidential informants were unable to ascertain the full extent of the conspiracy further supports the issuance of the wiretap order. *See Campos*, 541 F.3d at 747 (holding that confidential witnesses limited to "fringe" of drug organization supported necessity of wiretap); *United States v. Goodwin*, 496 F.3d 636, 640 (7th Cir. 2007) (same).

*Fifth*, Agent Biegalski explains that it would have been difficult or impossible for law enforcement to infiltrate the Atkins organization because Defendants relied on "longstanding relationships of trust" with their business associates. (*See* Biegalski Aff. ¶¶ 57-59.) Atkins, for example, relied exclusively on two individuals to coordinate distribution, delivery, and payment for his narcotics business. (*See id.*) Even if an undercover agent had been able to infiltrate the Atkins organization, Defendants' compartmentalization of their activities would likely have prevented the agent from

gaining a full understanding of the conspiracy. (*See id.*) The insular and secretive nature of the Atkins organization therefore supports the issuance of a wiretap. *See Campos*, 541 F.3d at 747 (holding that difficulty of agents infiltrating drug ring supported necessity of wiretap); *Price*, 418 F.3d at 778 (holding that wiretap was necessary because defendants "did not trust strangers").

*Sixth*, Agent Biegalski avers that the use of search warrants would have been ineffective and compromised the investigation. (*See* Biegalski Aff. ¶¶ 65-68.) Because Defendants stored contraband in multiple locations, many of which were unknown to the Government, any seizure would have represented just a fraction of the drugs and money in Defendants' possession. (*See id.*) Moreover, execution of search warrants would have tipped off Defendants to the Government's investigation, possibly causing them to flee the jurisdiction, destroy evidence, or step up counter-surveillance efforts. (*See id.*) Warrant-backed searches would therefore have been ineffective in determining the full scope of the Atkins conspiracy, thus supporting Judge Holderman's determination of necessity. *See Gray*, 410 F.3d at 343 (holding that search warrant would be ineffective in obtaining all of drug gang's contraband and would tip off defendants, thus supporting necessity of wiretap).

*Seventh*, Agent Biegalski explains that using grand jury subpoenas to investigate the Atkins organization would have been problematic for a number of reasons. (*See* Biegalski Aff. ¶ 69.) Like the execution of search warrants, grand jury subpoenas would have compromised the secrecy of the Government's investigation. (*See id.*) What is more, Biegalski states that, based on his experience as an FBI agent, he believes the Defendants would probably have invoked their Fifth Amendment rights. (*See id.*)

Although a grant of immunity would solve this problem, it could also result in the most culpable defendants being immunized from prosecution. (*See id.*) This too supports the issuance of the wiretap order. *See Campos*, 541 F.3d at 746-47 (holding that likelihood of Fifth Amendment invocation and limitations on prosecution arising from immunity counseled against use of grand jury subpoenas in drug case); *Gray*, 410 F.3d at 343 (same).

*Eighth*, Agent Biegalski avers that witness interviews would not have lead to useful evidence because, in his experience, gang members tend to honor their commitment to co-conspirators over their responsibilities to society. (*See* Biegalski Aff. ¶ 70.) Attempting to interview suspects would also have compromised the investigation by putting Defendants on notice of the Government's investigation. (*See id.*) The problems inherent in interviewing members of the Atkins organization therefore militates in favor of the wiretap. *See Campos*, 541 F.3d at 747 (holding that interviews with drug gang suspects were unlikely to be productive, supporting necessity of wiretap).

As demonstrated by Agent Biegalski's affidavit, this is not a case where the Government attempted to use a wiretap as the "initial step" in the investigation. *See McLee*, 436 F.3d at 763. To the contrary, the Government used almost every investigative tool available to it before applying for the wiretap at issue. (*See* Biegalski Aff. ¶¶ 49-73.) Due to the nature of Defendants' alleged conspiracy, however, and the countermeasures Defendants used to avoid detection, these traditional investigative techniques were of limited value in determining the extent of Defendants' criminal activity. (*See id.*) With respect to traditional investigative techniques the Government did not use, such as undercover agents, search warrants, and grand jury subpoenas, the

8

Government has proffered specific and convincing reasons why those techniques would have been ineffective. (*See id.*) Stewart complains that Agent Biegalski's affidavit is based on "boilerplate generalizations." (Mot. at 2.) This accusation is clearly unfounded in light of the specific facts adduced by Agent Biegalski. (Biegalski Aff. ¶¶ 49-73.) To the extent Stewart objects to certain generalizations based on Agent Biegalski's experience as an FBI agent, courts have consistently "upheld wiretap authorizations based on applications that contain statements about both general investigative experience in the type of crime involved and the particular facts of the case at hand." *Campos*, 541 F.3d at 749. The Seventh Circuit has "upheld the 'necessity' of wiretap orders on the basis that investigators were 'having trouble fingering other members of the conspiracy,' and that the wiretaps 'allowed the government to ascertain the extent and structure of the conspiracy.'" *McLee*, 436 F.3d at 763 (quoting *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991); *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995)) (internal citations omitted). Because the Government has adduced case-specific facts from its investigation showing that a wiretap was reasonably necessary to ascertain the full extent of Defendants' conspiracy, the court declines to suppress evidence garnered as a result of the February 2007 wiretap.

**B.     Subsequent Wiretaps**

Stewart argues that evidence obtained from the Government's subsequent wiretaps should be suppressed because "the subsequent wiretaps were based on the initial, facially insufficient affidavit." (Reply at 5, Doc. No. 233.) Since the court has already held that the February 2007 wiretap was valid, Stewart's argument fails.

Stewart argues further that evidence from subsequent wiretaps should be suppressed because "at that point the Government had garnered enough evidence through its initial wiretapping in conjunction with the evidence it had already garnered . . ." (Mot. at 2). Stewart fails to cite any authority, nor is the court aware of any, to support the proposition that the Government must stop investigating when it has enough evidence to prosecute. Case law in the Seven Circuit is clearly to the contrary: "Even if the government had enough evidence to indict [the defendant] prior to obtaining the wiretaps, this fact would not preclude a finding of necessity." *Campos*, 541 F.3d at 749.

The Government acknowledges in its response brief that Defendants eventually came to believe they were under surveillance at some point after the initial wiretap had been placed. (Resp. at 17.) If this is true, Stewart argues, the Government should have ceased the surveillance and turned to more traditional methods of investigation, since Defendants already knew they were being watched. (Reply at 6.) Although creative, Stewart's argument misses the point. The Government eschewed the use of overt investigative methods, such as warrant searches, grand jury subpoenas, and suspect interviews, because they would have been ineffective, not just because they would have given away the game. As set forth above, the Government's limited knowledge of Defendants' stash houses would have prevented the Government from seizing all of the Atkins organization's contraband through warrant-backed searches. (*See* Biegalski Aff. ¶ 69.) According to Agent Biegalski, Defendants would have been unlikely to cooperate with law enforcement in a grand jury proceeding or interview, preferring instead to honor their commitment to the Atkins organization. (*See id.* ¶¶ 65-68, 70.) What is more, though Defendants may have known about the Government investigation, the record does
10

not reflect that Defendants knew their phones had been tapped. (*See* Mot.; Resp.; Reply.) Thus, Defendants' awareness of the investigation likely made them more cautious in conducting their business affairs, and thus more dependent on the use of their cell phones, further supporting the court's finding of necessity for a wiretap.

## IV. CONCLUSION

For the reasons set forth above, Stewart's motion to suppress [Doc. No. 221] is denied.

ENTER:  /s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 29, 2010